**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**LYNN DETILLION,**

         **Plaintiff,**

                    **:**

      **v.**

**OHIO DEPARTMENT OF**
**REHABILITATION AND**
**CORRECTION,** *et al.,*         **:**

        **Defendants.**

**Case No. 2:22-cv-2671**
**Judge Sarah D. Morrison**
**Magistrate Judge Kimberly A.**
**Jolson**

**OPINION AND ORDER**

      This matter is before the Court on two Motions for Summary Judgment. First is Ohio Department of Rehabilitation and Correction's ("DRC") Motion. (DRC Mot., ECF No. 76.) Lynn Detillion opposed the Motion[1] (Opp., ECF No. 92), and DRC replied (Reply, ECF No. 33). The second is Ohio Civil Service Employees Association, AFSCME Local 11's ("OCSEA" or the "Union") Motion. (OCSEA Mot., ECF No. 72.) Ms. Detillion also opposed that Motion (Opp., ECF No. 88), and OCSEA replied (Reply, ECF No. 95). Both Motions are ripe for a decision and, for the reasons below, the Motions are **GRANTED**.

---

[1] Ms. Detillion neither moved for an extension nor sought leave of court before filing her memorandum in opposition three days late. For present purposes, the Court accepts Ms. Detillion's Notice explaining her technical difficulties that caused the delay (ECF No. 96) but warns that failure to adhere to the Court's rules may result in future late filings being stricken.

## I.    RELEVANT FACTS[2]

DRC is the state agency that operates correctional institutions responsible for the care and housing of Ohio's incarcerated adult population. One such institution is the Correctional Reception Center ("CRC"), which is where incarcerated persons are initially housed after transfer from a local jail but before transport to the correctional institution where they will serve their prison sentence. (DRC Mot., PAGEID # 5599, 5601.) At CRC, the warden is responsible for disciplinary decisions, including hiring and firing. (*See* Frederick Decl. ¶ 13, ECF No. 76-2, PAGEID # 5993.) During the relevant time, Thomas Schweitzer served as the warden until December 2019 when George Frederick II became the Acting Warden; Frederick was promoted to warden in January 2020. (Schweitzer Decl. ¶ 3, ECF No. 76-3, PAGEID # 6007; Frederick Decl. ¶ 5, PAGEID # 5992.)

---

[2] Both DRC and OCSEA request that the Court disregard portions of Ms. Detillion's affidavits. (DRC Reply, ECF No. 94; OCSEA Reply, ECF No. 95.) OCSEA also argues that Ms. Detillion lacks personal knowledge to authenticate certain exhibits and that some exhibits are incomplete. Fed. R. Civ. Pro. 56(e) requires that affidavits "set forth such facts as would be admissible at trial." Conclusory affidavits cannot be used to create a question of fact. *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 584–85 (6th Cir.1992). At the summary judgment stage, a court may only consider affidavits that are based on personal knowledge and exhibits that have been properly authenticated. *See Brainard v. Am. Skandia Life Assur. Corp.* 432 F.3d 655, 667 (6th Cir.2005); *Kanoski v. Sterling Paper Co.*, No. 2:09-CV-0439, 2014 WL 1384159, at *3 (S.D. Ohio Apr. 9, 2014) (Smith, J.) (explaining that documents not authenticated in accordance with the Federal Rules of Civil Procedure are inadmissible). Accordingly, the Court did not rely on Ms. Detillion's affidavits (ECF No. 83-85, 91) to the extent that she failed to explain the basis of her knowledge or her unauthenticated exhibits.

Ms. Detillion, a white female, began her employment with DRC as a correctional officer in 2015 and spent most of her tenure at CRC. (OCSEA Detillion Dep. 12:16-19; 13:4-9, ECF No. 62, PAGEID # 1179-80.) At CRC, she was assigned as the "B Officer" conducting range checks[3] on the unit, responding to occurrences such as fights or requests for assistance on other units, and escorting inmates to and from Unit R-2. (*Id.* at 22:23-24, 23:8-17, PAGEID # 1189-90.) Her assigned partner was Angelo Brodie, the "A Officer"; he performed the administrative work on the unit. (*Id.* at 23:18-24:15, PAGEID # 1190-91.) Because his duties included timekeeping, Mr. Brodie informed Ms. Detillion when range checks were needed and entered the range checks in the computer system when completed. (*Id.*) Both officers were responsible for following post orders.[4] (DRC Mot., PAGEID # 5600-01.)

Ms. Detillion and Mr. Brodie were members of OCSEA, which has a collective bargaining agreement with DRC.

## A.    The Jones Incident

On November 26, 2019, inmate Ronnie Jones was assigned to Unit R-2. (DRC Detillion Dep. 79:6-17, ECF No. 64, PAGEID # 2193.) That afternoon, Mr. Jones was disruptive—he would not stay in his assigned area, was yelling to other

---

[3] A range check is when an officer on a unit looks inside each cell and room on the unit to ensure the safety of inmates and staff; range checks must be conducted within specific time intervals. (Owens Dep. 80:1-3, 81:4-8, ECF No. 60, PAGEID # 800-01.)

[4] Post orders contain detailed regulations regarding every aspect of the institution and are specific to that post. They instruct officers on how to handle various circumstances, including inmates' threats of suicide. (*See* OCSEA Dep. Ex. U-33, ECF No. 65-1, PAGEID # 3173-86.)

inmates, and making gang signs and calls—so he was separated from the other inmates and confined to an individual cell in the upper range of Unit R-2. (*Id.* at 80:24-81:9, 84:17-85:7, 17-19, PAGEID # 2194-95, 2198-99). When Mr. Jones learned that another inmate had been removed from Unit R-2, he became more disruptive and threatened to take his own life. (*Id.* at 91:12-21, PAGEID # 2205.)

DRC's Suicide Prevention Policy requires any staff who come into contact with an inmate threatening suicide to notify the Shift Commander of the threat and to maintain constant observation or supervision of the inmate until security staff moves the inmate to a safe cell. (OCSEA Detillion Dep. Ex. U-34, ECF No. 62-1, PAGEID # 1643.) When Mr. Jones threatened suicide, Ms. Detillion was in front of his cell but Mr. Brodie had left the area, so she "screamed" to Mr. Brodie to tell him of Mr. Jones's threat and instructed Mr. Brodie to inform the captain. (DRC Detillion Dep. 90:17-91:11, 91:22-92:23, PAGEID # 2204-07.) In response, Mr. Brodie immediately informed one of the acting shift supervisors; neither he nor Ms. Detillion informed the Shift Commander of Mr. Jones's threat. (OCSEA Detillion Dep. 127:17-128:4, PAGEID # 1294-95.)

Ms. Detillion also did not keep constant observation or supervision of Mr. Jones after his threat. (Owens Decl. Ex. 1, ECF No. 76-1, PAGEID # 5652-55.) Instead, she periodically looked into his cell then left him unattended for approximately 23 minutes. (*Id.*; DRC Detillion Dep. 134:22-139:23, PAGEID # 2248-53). When she returned, Mr. Jones was hanging from his bedframe. (DRC Detillion Dep. 141:4-13, PAGEID # 2255.) She then called out to Mr. Brodie telling

4

him about Mr. Jones's apparent suicide and radioed for assistance. (*Id.*) Efforts to revive Mr. Jones failed and he was later pronounced dead. (OCSEA Detillion Dep. Ex. U-32, ECF No. 62-1, PAGEID # 1576.)

The Ohio State Highway Patrol ("OSHP") is responsible for any criminal investigation of an inmate's death; DRC's internal investigation could not begin until OSHP concluded its investigation. (Frederick Decl. ¶¶ 21-22, ECF No. 76-2, PAGEID # 5994-95.) Accordingly, CRC Investigator Scott Thompson conducted a preliminary investigation to determine whether criminal conduct was involved in Mr. Jones's death. (*Id.*)

Investigator Thompson interviewed multiple inmates housed in Unit R-2 when the suicide occurred or connected to Mr. Jones. (Owens Decl. ¶ 5, Ex. 1, ECF No. 75, PAGEID # 5237-38.) Security staff, medical staff, and mental health staff completed incident reports, and several inmates provided voluntary statements. (*Id.*) Some inmates alleged that Ms. Detillion encouraged Mr. Jones to take his own life by telling him "your rope and noose is too small," saying that "he doesn't have the guts to kill himself," and calling him a "fag" and a "pussy." (Frederick Dep. 117:7-118:9, ECF No. 59, PAGEID # 604.)

### B. Ms. Detillion Gets Reassigned, But Mr. Brodie Does Not

At least 12 inmates blamed Ms. Detillion for Mr. Jones's death and threatened to harm her. (*Id.*) When Warden Schweitzer learned of the threats, he pulled her from Unit R-2 and placed her on a No Inmate Contact Order for her own protection. (Schweitzer Decl. ¶ 5, ECF No. 76-3, PAGEID # 6007; Frederick Dep. Ex. F2, ECF No. 59-1, PAGEID # 675.) Warden Frederick extended Ms. Detillion's

reassignment and No Inmate Contact status in December 2019 because, by that time, an active investigation into Ms. Detillion's conduct was underway. (DRC Detillion Dep. 145:17-150:22, ECF No. 64, PAGEID # 2259-67; Frederick Dep. 58: 11-19, ECF No. 59, PAGEID # 545.)

While on a No Inmate Contact Order, the number of available assignments is limited. (Frederick Decl. ¶ 31, ECF No. 76-2, PAGEID # 5996.) Ms. Detillion was initially reassigned to the Control Center, which maintains security systems and firearms and serves as the communication headquarters. (Frederick Decl. ¶ 32, PAGEID # 5996.) Ms. Detillion served there for five months. (DRC Detillion Dep. 146:10-19, PAGEID # 2260.) She was then reassigned to Area Patrol, tasked with securing the perimeter and surrounding roads. (Frederick Decl. ¶ 33, PAGEID # 5996.) Officers assigned to Area Patrol are considered "extras" and are generally not issued firearms. (Frederick Decl. ¶ 33, PAGEID # 5996.)

There were no reported threats against Mr. Brodie, and because there were no allegations that he had taunted Mr. Jones, Mr. Brodie continued in his regular assignment. (Frederick Dep. 55:20-56:1, ECF No. 59, PAGEID # 542-43.)

## C.  DRC's Internal Investigation

About two weeks after Mr. Jones's death, Warden Frederick was notified that OHSP would not be pursuing criminal charges. (*See* Frederick 55: 1-13, PAGEID # 542.) DRC then commenced its internal investigation by appointing an outside investigator, Charlotte Owens. (Goliday ¶ 7, ECF No. 76-4, PAGEID # 6014; Frederick Decl. ¶ 23, PAGEID # 5996; Owens Dep. 12:15-13:5, ECF No. 60, PAGEID # 732, 736.) Ms. Owens reviewed security video footage and interviewed

6

officers, inmates, and other CRC employees. (Owens Dep. 102:5-10, PAGEID # 822; *see generally* OCSEA Detillion Dep. Ex. U-32, ECF No. 62-1, PAGEID # 1564-96). She also interviewed Mr. Brodie and Ms. Detillion. (OCSEA Detillion Dep. Exs. U-28, U-31, ECF No. 62-1, PAGEID # 1535-45, 1552-63.)

Ms. Owens concluded that Ms. Detillion and Mr. Brodie violated several of DRC's policies and post orders. First, she concluded that both officers violated DRC's Suicide Prevention Policy and post orders when they failed to maintain constant observation of Mr. Jones after his threat of suicide. (OCSEA Detillion Dep. Ex. U-32, ECF No. 62-1, PAGEID # 1586-87.) Second, she found that both officers failed to conduct appropriate range checks and failed to look into some cells then falsified the range check logs. (OCSEA Detillion Dep. Ex. U-32, ECF No. 62-1, PAGEID # 1591-93.) Third, she found that the officers did not review the post orders throughout November 2019 even though they attested that they did. (OCSEA Detillion Dep. Ex. U-32, ECF No. 62-1, PAGEID # 1594.) Finally, Ms. Owens determined that Ms. Detillion called Mr. Jones derogatory names and encouraged him to take his own life and that Mr. Brodie condoned Ms. Detillion's conduct through his inaction.[5] (OCSEA Detillion Dep. Ex. U-32, ECF No. 62-1, PAGEID # 1587-89). Ms. Owens submitted her findings to DRC.

---

[5] Ms. Detillion denies that she taunted Mr. Jones and complains that Ms. Owens relied on hearsay in reaching her conclusions. (Opp., ECF No. 92, PAGEID # 6456.) But an employer's decision to terminate an employee can be based on hearsay. *See Waters v. Churchill,* 511 U.S. 661, 675 (1994) (explaining that it is inappropriate to force an "employer to come to factual conclusions through procedures that substantially mirror the evidentiary rules used in court ... [employers] often do rely on hearsay, on past similar conduct, on their personal

### D.     DRC Terminates Ms. Detillion's and Mr. Brodie's Employment

When Warden Frederick received Ms. Owens's findings, he initiated disciplinary proceedings against Ms. Detillion and Mr. Brodie. (Frederick Dep. 140:3-6, ECF No. 59, PAGEID # 627). As to Ms. Detillion, a pre-disciplinary hearing was held in August 2020, at which time she had the opportunity to present evidence on her own behalf. (DRC Detillion Dep. 207:6-21, ECF No. 64, PAGEID # 2321; Ex. 26, ECF No. 64-1, PAGEID # 2725.) Nevertheless, the hearing officer determined that Ms. Detillion violated four of DRC's Employee Rules of Conduct:

- Rule 7 – Failure to follow post orders, administrative regulations, policies, or written or verbal directives;

- Rule 8 – Failure to carry out a work assignment or the exercise of poor judgment in carrying out an assignment;

- Rule 22 – Falsifying, altering, or removing any document or record; and

- Rule 41 Current – Unauthorized actions, a failure to act or a failure to provide treatment that could harm any individual under the supervision of the Department.

(*Id.*, PAGEID # 2716-17.)

Warden Frederick terminated Ms. Detillion based on the hearing officer's conclusions. (Frederick Decl. ¶¶ 12-18, ECF No. 76-2, PAGEID # 5993-94.) She was served a notice of removal stating that her termination was effective September 30,

---

knowledge of people's credibility, and on other factors that the judicial process ignores."); *see also Abel v. Dubberly*, 210 F.3d 1339 n.5 (11th Cir. 2000) (citation omitted) ("An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.")

2020, and informing her that she was coded as "Removed – Not Recommended for Rehire" due to "criminal, quasi-criminal and/or other egregious misconduct." (OCSEA Detillion Dep. Ex. U-47, ECF No. 62-2, PAGEID # 1770.) DRC sent Ms. Detillion a COBRA notice on October 12, 2020. (Goliday Decl. Ex. 3, ECF No. 76-4, PAGEID # 6020.)

Mr. Brodie also had a pre-disciplinary hearing in August 2020 before the same hearing officer, following which, the hearing officer found that he violated the same rules as Ms. Detillion. Mr. Brodie was terminated with the same effective date as Ms. Detillion and was also informed that he was coded as "Removed – Not Recommended for Rehire." (Frederick Decl. ¶ 35, Exs. 1, 2, PAGEID # 5999-6000.)

### E.    Mr. Brodie is Reinstated but Ms. Detillion Is Not

In October 2020, OCSEA grieved both terminations and appointed Staff Representative Patricia Hill to handle the grievances. (Hill Dep. 41:5-21, ECF No. 63, PAGEID # 1913.) DRC denied both grievances and OCSEA timely appealed. (*Id.*)

DRC and OCSEA then mediated both grievances. When the mediations were unsuccessful, OCSEA presented both grievances to its three-member Discharge Review Committee to determine whether either grievance would be taken to arbitration. (*Id.* at 41:12-43:6, PAGEID # 1913-15.) It is at this stage that Ms. Detillion's grievance took a different path than Mr. Brodie's.

As to Ms. Detillion, Ms. Hill tried to negotiate a last chance agreement with DRC, but DRC rejected her proposal. (*Id.* at 98:4-9, PAGEID # 98.) Ms. Hill then recommended to the Discharge Review Committee that OCSEA not arbitrate Ms.

Detillion's grievance. (*Id.* at 42:3-43:6, PAGEID # 1914-15.) Ms. Hill testified that she did not believe arbitration would be successful because, among other reasons, Ms. Detillion did not follow her training when responding to Mr. Jones's threat of suicide, had worked at DRC for only five years, and had been reassigned and placed on a No Inmate Contact Order during the investigation. (*Id.* at 49:1-17, PAGEID # 1920-21; Ex. 12, ECF No. 63-1, PAGEID # 2053-54.) Ms. Hill believed that Ms. Detillion lacked credibility and refused to accept responsibility for her actions surrounding Mr. Jones's death. (*Id.*) The Discharge Review Committee agreed with Ms. Hill's recommendation and voted to withdraw Ms. Detillion's grievance.

Ms. Detillion was informed of the decision to withdraw her grievance in March 2021; she appealed that decision to General Counsel Kelly Phillips. (OCSEA Detillion Dep. Ex. U-49, U-50, U-51, ECF No. 62-1, PAGEID # 1773-86.; Duco Decl. ¶ 6, ECF No. 72-4, PAGEID # 4848.) Ms. Phillips denied the appeal on March 30, 2021. (OCSEA Detillion Dep. Ex. U-52, ECF No. 63-1, PAGEID #1787-88.)

But as to Mr. Brodie, Ms. Hill recommended to the Discharge Review Committee that his grievance should proceed to arbitration. This recommendation was based on Mr. Brodie's 10-year tenure at DRC,[6] that he had no prior discipline, and he continued to work on Unit R-2 during the investigation. (Hill Dep. 86:11-19, 87:15-23, ECF No. 63, PAGEID # 1958-59; Hill Dep. Ex. 18, ECF No. 63-1,

---

[6] Ms. Hill believes that an employee must have at least eight years of tenure for tenure to be a mitigating factor in arbitration, while Ms. Phillips believes that the necessary tenure is 10 years. (Hill Dep. 136: 15-17, ECF No. 63, PAGEID # 2008; Phillips Dep. 66:13-25, ECF No. 61, PAGEID # 1035.)

PAGEID # 2063-64.) The Discharge Review Committee accepted Ms. Hill's recommendation and advanced Mr. Brodie's grievance to arbitration. To resolve the arbitration, DRC settled with OCSEA by agreeing to reinstate Mr. Brodie at a different facility pursuant to a last chance agreement. (Goliday Decl. ¶¶ 11, 13, ECF No. 76-4, PAGEID # 6013.)

## II.    MS. DETILLION'S PROTECTED CONDUCT

Ms. Detillion made several complaints about discrimination or harassment. First, she complained that another employee, Major Robert Nutter, inappropriately touched her. (*See* OCSEA Detillion Dep. 60:7-62:18, ECF No. 62, PAGEID # 1227-29.) She testified that she completed an incident report about the event, but the record is unclear as to when the incident occurred and when she filed her complaint. (DRC Detillion Dep. 24: 17-25:5, ECF No. 64, PAGEID # 2138-39.) She says the incident occurred before she filed her February 2020 EOD Complaint and that she reported it in 2019 or early 2020.[7] (*Id.* at 24: 21-25: 7; *see* OCSEA Detillion Dep. 60:7-62:18, ECF No. 62, PAGEID # 1227-29.)

 Second, she filed a complaint with the Department of Administrative Services, Equal Opportunity Division in February 2020, alleging sex discrimination and sexual harassment ("EOD Complaint"). (DRC Detillion Dep. Ex. 7, ECF No. 64-1, PAGEID # 2484-86.)

Ms. Detillion also filed three separate Equal Employment Opportunity Commission ("EEOC") charges. She filed two charges against DRC, one in

---

[7] DRC believes that the incident occurred, if at all, in 2017. (DRC Mot., ECF No. 76, PAGEID # 5629.)

December 2020 and another in September 2021, alleging sex and race discrimination and retaliation. (*Id.* Exs. 3, 4, PAGEID # 2472-80.) Her third EEOC charge was filed in September 2021[8] against OCSEA, asserting that OCSEA discriminated against her on the basis of her sex and race. (Duco Decl. Ex. A, ECF No. 72-5, PAGEID # 4850.) She received her Notice of Right to Sue on all three EEOC charges.

## III.    STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

---

[8] Ms. Detillion claims that this EEOC charge was filed on August 31, 2021, but the charge states that it was submitted on September 18, 2021. (Duco Decl. Ex. A, ECF No. 72-5, PAGEID # 4850.)

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

## IV.   ANALYSIS

### A.   Claims Against DRC

Following the Court's Opinion and Order on DRC's Partial Motion for Judgment on the Pleadings, Ms. Detillion has four remaining Title VII claims against DRC: 1) sex discrimination (Count 2), 2) race discrimination (Count 4), 3) sexual harassment/hostile work environment (Count 5), and 4) retaliation (Count 6). (ECF No. 43.)

#### 1.   Sex and Reverse Race Discrimination Claims (Counts 2 and 4)

Title VII makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Absent direct evidence of discrimination, such claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir.

2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), as modified by *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)). Under this approach, a plaintiff must first establish a *prima facie* case of discrimination to create a rebuttable presumption that the employer engaged in unlawful conduct. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07 (1993).

To establish a *prima facie* case of discrimination, a plaintiff must show (1) she was a member of a protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) she was treated differently than a similarly situated employee who was not a member of the protected class. *Id.* In reverse race discrimination cases, the first and fourth elements are slightly different in that the first element requires a plaintiff to demonstrate "background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority," and the fourth element requires evidence that the plaintiff was treated differently than a similarly situated employee who is not a member of the majority. *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 255 (6th Cir.2002)*; see Leadbetter v. Gilley*, 385 F.3d 683, 690 (6th Cir. 2004) (citing *Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003)) (applying *McDonnell Douglas* inquiry to claims of reverse race discrimination). Ms. Detillion fails on the fourth element of her *prima facie* case for both claims, so this is where the Court focuses its analysis.

To show disparate treatment, a plaintiff must establish that she is similarly situated in all relevant respects to the employee to whom she compares herself.

*Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998); *Mitchell v. Toledo*, 964 F.2d 577, 583 (6th Cir. 1992). In other words, they "must have dealt with the same supervisor, have been subject to the same standards[,] and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, 964 F.2d at 582-83. The misconduct of the similarly situated employees must be of "comparable seriousness" to the plaintiff's infractions. *Id.* The burden to show such "comparability" rests with plaintiff. *Id.* at 583 n. 5.

Ms. Detillion contends that Mr. Brodie, her African American male partner, received more favorable treatment than she, even though they were similarly situated in all relevant respects: they were both correctional officers, they reported to the same supervisors, both were subjected to the same work rules and standards, and both were determined to have violated the same rules. (Opp., ECF No. 92, PAGEID # 6456.) She claims she was treated differently as to 1) her reassignment and being placed under a No Inmate Contact Order, 2) her termination, and 3) DRC's failure to reinstate her employment or rehire her. (Compl. ¶¶ 68, 76.)

***Reassignment***. Ms. Detillion argues that her reassignment and No Contact Order throughout the internal investigation while Mr. Brodie remained on Unit R-2 was discriminatory. But the evidence reveals why the two were treated differently. Warden Schweitzer first reassigned Ms. Detillion and placed her on a No Inmate Contact Order because inmates were threatening her following Mr.

15

Jones's death; he moved her for her own protection. (Schweitzer Decl. ¶ 5, ECF No. 76-3, PAGEID # 6007-08; Frederick Dep. Ex. 21, ECF No. 59-1, PAGEID # 676.) In contrast, there were no known threats against Mr. Brodie.

Ms. Detillion does not dispute that there were security reasons, at least initially, for her reassignment. Rather, she complains that she was not returned to Unit R-2 when the threat was over even though both she and Mr. Brodie were under investigation. (*See* Opp., ECF No. 92, PAGEID # 6457.)

Reassignments were not unusual during an investigation of an officer's alleged misconduct. (*See* Frederick Decl. Ex. 4, ECF No. 76-2, PAGEID # 6003-06.) Both Warden Schweitzer and Warden Frederick had previously reassigned officers under investigation, of both sexes and multiple races. (*Id.*; Schweitzer Decl. Ex. 1, ECF No. 76-3, PAGEID # 6010-12.) Warden Frederick explained that he extended Ms. Detillion's reassignment because the nature of the allegations caused him concern about the safety of the inmates. (Frederick Dep. Ex. F16, ECF No. 59-1, PAGEID # 695.) The allegations against Mr. Brodie were of a different nature— there were no allegations that he actively taunted or mocked Mr. Jones, only that he should have done something to stop Ms. Detillion. (*See* Fredrick Dep. 55:20- 58:13, Ex. F21, ECF No. 59-1, PAGEID # 709.) Ms. Detillion makes no effort to show that Mr. Brodie's conduct was of comparable seriousness and, in fact, his role is distinguishable because he was not alleged to have actively encouraged an inmate to commit suicide.

Mr. Brodie was not similarly situated to Ms. Detillion with regard to her reassignment.

***Termination***. Even though Mr. Brodie did not engage in the same conduct as Ms. Detillion, he was in fact terminated for his conduct related to Mr. Jones. Both he and Ms. Detillion were found to have violated the same DRC rules and both were coded as "Removed – Not Recommend for Rehire." Ms. Detillion cannot meet the fourth element of her *prima facie* case when they were treated the same.

***Reinstatement/Rehire***. Ms. Detillion complains that, although DRC determined that she and Mr. Brodie violated the same rules, terminated them, and coded them as "Removed – Not Recommended for Rehire," it only reinstated Mr. Brodie. (Opp., ECF No. 92, PAGEID # 6448.) She also complains that she applied for open positions with DRC but was not rehired. (Compl. ¶ 58, PAGEID # 62.)

Mr. Brodie did not re-apply for an open position; he was rehired as a result of OCSEA's grievance. And as to his reinstatement, the circumstances are sufficiently differentiating. OCSEA pursued only Mr. Brodie's grievance to arbitration because, unlike Ms. Detillion, he had worked at DRC for 10 years, had no prior discipline, and had not actively taunted Mr. Jones. Thus, Ms. Detillion cannot establish the fourth element of her *prima facie* case as to Mr. Brodie's reinstatement/rehire.

DRC's Motion for Summary Judgment on Ms. Detillion's sex and race discrimination claims (Counts II and IV) is **GRANTED**.

## 2.    Retaliation Claim (Count 6)

A Title VII retaliation claim can be established through circumstantial evidence that would support an inference of retaliation. *Imwalle v. Reliance Med. Prod., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008). Ms. Detillion establishes her *prima facie* case by showing: (1) she engaged in protected activity; (2) DRC knew of her protected activity; (3) DRC then took "materially adverse" actions against her; and (4) Ms. Detillion's protected conduct was the but-for cause of the adverse action. *Burns v. City of Saginaw*, 601 F. App'x 353, 357 (6th Cir. 2015) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)).

Ms. Detillion claims that she engaged in protected activity when she complained internally about Major Nutter, when she filed her EOD Complaint, and when she filed EEOC charges. She claims that her reassignment, her termination and "Not for Rehire" coding, DRC's refusal to reinstate her, and an untimely October 2020 COBRA notice from DRC were retaliatory. (Compl. ¶¶ 59, 85, PAGEID # 67.) However, because Ms. Detillion failed to address the COBRA notice in response to DRC's summary judgment motion, any argument that DRC engaged in retaliation by failing to send a timely COBRA notice is waived. *See Dage v. Time Warner Cable*, 395 F. Supp. 2d 668, 679 (S.D. Ohio 2005) (Dlott, J.) (Plaintiff waived opposition to an argument by failing to address it in his responsive brief).

### i.    Her reassignment was not a materially adverse employment action.

Under the third element of her *prima facie* case, Ms. Detillion must put forth evidence of a materially adverse action, which "means it well might have dissuaded

18

a reasonable worker from making or supporting a charge of discrimination."
*Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (internal quotation
marks and citations omitted). "Whether an employer's action is materially adverse
depends upon the circumstances of the particular case and should be judged from
the perspective of a reasonable person in the plaintiff's position, considering all the
circumstances." *Burlington N.*, 548 U.S. at 57 (internal quotation marks omitted).

Here, Ms. Detillion's reassignment was not "materially adverse." She
complains that DRC transferred her to Area Patrol where she had no access to
certain amenities in retaliation to her EOD complaint. (Opp., ECF No. 92, PAGEID
# 6470-72.) Though her transfer to Area Control is close in time to her EOD
Complaint, the only evidence that this was materially adverse is her own
subjective belief that Area Patrol is less prestigious and more dangerous (even
though she was protected from inmate contact). This evidence is insufficient to
show that a reasonable worker would have been dissuaded from complaining about
discrimination. *See, e.g.*, *Blackburn v. Shelby Cnty.*, 770 F. Supp. 2d 896, 925 (W.D.
Tenn. 2011) (finding that plaintiff's subjective impressions as to the desirability of
one position over another did not establish that her reassignment was retaliatory).
Therefore, her retaliation claim on this basis fails.

> ## ii. There is no causal connection between her protected activity, on the one hand, and her termination, coding, and DRC's refusal to reinstate her, on the other.

A retaliation claim "must be proved according to traditional principles of
but-for causation," which "require[] proof that the unlawful retaliation would not

have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar,* 570 U.S. at 360. To establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action. *Dixon v. Gonzales,* 481 F.3d 324, 333 (6th Cir.2007). A temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection. *See Randolph v. Ohio Dep't of Youth Servs.,* 453 F.3d 724, 737 (6th Cir.2006). And of course, protected activity after an adverse employment action cannot form the basis of a retaliation claim. *Weatherby v. Fed. Exp.*, 454 F. App'x 480, 492 (6th Cir. 2012); *Simmons v. Ohio Rehab. Servs. Comm'n*, No. 13-4496, 2015 WL 13926948, at *3 (6th Cir. Jan. 27, 2015).

Ms. Detillion has not demonstrated that her protected activity is the "but for cause" of any materially adverse action. Her complaint about Major Nutter was filed before February 2020, so at least eight months had elapsed between that complaint and the alleged retaliation, which is too much time to establish a temporal connection. *See Hafford v. Seidner,* 183 F.3d 506, 515 (6th Cir.1999) (finding that lapses of from two to five months between the plaintiff's EEOC charge and various disciplinary actions were insufficient to raise a *prima facie* retaliation claim); *see also Lahar v. Oakland County,* 304 Fed.Appx. 354, 359 (6th Cir.2008) (finding that a five-month gap between protected conduct and alleged retaliation could not sustain a causation inference, absent other evidence of retaliation). There

are no other indicia of a causal connection between her complaint about Major Nutter and any of the retaliatory acts.

Next, Ms. Detillion's claim that her February 2020 EOD Complaint caused the alleged retaliation also does not pass muster under the "traditional principles of but-for causation." Seven months had passed between her complaint and the alleged retaliatory actions and there are no other indicia of causation.

Finally, her retaliation claim based on the December 2020 and September 2021 EEOC charges fails because these charges were filed *after* her termination (September 2020) and coding (October 2020). To the extent that Ms. Detillion considers the failed January 2021 mediation DRC's refusal to reinstate her, there is no indicia of retaliation other than arguable temporal proximity, which is not enough to sustain her retaliation claim.

Ms. Detillion attempts to save her claims by arguing that these retaliatory actions qualify as a continuing violation. But the Supreme Court has held that the continuing violation doctrine cannot save discrete acts of retaliation. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002). Each retaliatory act constitutes a separate actionable employment decision, and discrete acts such as refusal to hire are easy to identify. *Id.* Each of DRC's decisions—to fire her, to code her "Not for Rehire," and to refuse to reinstate or hire her—were discrete acts of retaliation so the continuing violations doctrine does not apply. *See, e.g., Click v. Thompson*, 898 F. Supp. 2d 927, 932 (E.D. Ky. 2012) (noting that the employer's

three decisions were discrete acts of discrimination or retaliation so that the continuing violations doctrine does not apply).

The Court **GRANTS** DRC's Motion for Summary Judgment on Ms. Detillion's retaliation claim (Count VI).

### 3. Sexual Harassment/Hostile Work Environment (Count 5)

For Ms. Detillion's sexual harassment/hostile work environment claim to survive summary judgment, she must establish that: (i) she is a member of a protected class; (ii) she was subjected to unwelcome sexual harassment; (iii) the harassment complained of was based on sex; (iv) the harassment had the effect of unreasonably interfering with her work performance and created a working environment that was intimidating, hostile, or offensive; and (v) a basis for employer liability exists. *Fleenor v. Hewitt Soap Co.*, 81 F.3d 48, 49 (6th Cir. 1996), *cert. denied*, 519 U.S. 863 (1996).

The fourth element of this claim encompasses both objective and subjective components. That is, "the conduct must be severe enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The objective component requires courts to consider "whether the workplace is so permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Grace v. USCAR*, 521 F.3d 655, 678–79 (6th Cir. 2008) (internal quotation marks and citation omitted).

This consideration encompasses "the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's performance." *Harris*, 510 U.S. at 23. Case law sets "a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory." *Philips v. UAW Int'l*, 854 F.3d 323, 328 (6th Cir. 2017). "Conduct that is merely offensive is not actionable" as a hostile work environment claim; "the harassment must consist of more than words that simply have sexual content or connotations." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008) (citations omitted).

Ms. Detillion claims that the following created a hostile work environment:

1) Reassigning her from her post and subjecting her to a "No Inmate Contact" Order,

2) Assigning her to the Control Center,

3) Denying her access to Human Resources, the facility's vending machines located in Building 1, and to check biddable job assignments,

4) Eliminating her ability to work overtime,

5) Denying her the ability to attend in-service continuing education training and requiring a supervisor escort her to training,

6) Reassigning plaintiff to area patrol without a weapon, "while being isolated,"

7) Denying Ms. Detillion's ability to attend Captain Patrick's retirement party, and

8) Touching of her neck and top of her shirt by Major Nutter.

(Compl. ¶¶ 80-81, PAGEID # 66; Opp., ECF No. 92, PAGEID # 6469.) Even accepting Ms. Detillion's characterization of her reassignment, her claim does not satisfy the legal standard for sex-based hostile work environment. The only

23

allegation of a physical nature is that Major Nutter touched her, and this was an isolated incident. There is no evidence that Ms. Detillion faced humiliating harassment or that these things unreasonably interfered with her job performance. These incidents fall well short of the severe and pervasive harassment necessary for a redressable claim.

Accordingly, DRC's motion for summary judgment on Ms. Detillion's hostile work environment claims (Count V) is **GRANTED**.

## B. Claims Against OCSEA

Following the Court's Opinion and Order on OCSEA's Partial Motion to Dismiss, Ms. Detillion has three remaining claims against OCSEA: federal and state law sex and race discrimination claims (Counts 1 and 3) and aiding and abetting DRC's alleged discrimination and retaliation (Count 8).[9] OCSEA argues that this Court lacks subject matter jurisdiction over Ms. Detillion's claims. In the alternative, OCSEA argues that 1) her aiding and abetting claim must be dismissed because the Court dismissed the underlying state law discrimination claims against DRC, and 2) her claims against OCSEA fail as a matter of law. Each of OCSEA's arguments are addressed in turn.

### 1. Subject Matter Jurisdiction

Under Ohio law, it is an unfair labor practice for a labor union to fail to fairly represent all public employees in a bargaining unit. Ohio Rev. Code § 4117.11(B)(6). The State Employment Relations Board ("SERB") has exclusive

---

[9] Although Ms. Detillion calls OCSEA a "joint tortfeasor" (Opp., ECF No. 88-1, PAGEID # 6211), there are no remaining tort claims against DRC.

primary jurisdiction to resolve unfair labor practices charges alleging violations of Ohio Rev. Code Chapter 4117. *Shoemake v. Mansfield City Sch. Dist. Bd. of Educ.*, 61 F. Supp. 3d 704, 737 (N.D. Ohio 2014) (collecting cases). Nevertheless, the Ohio Supreme Court has noted that "SERB does not have exclusive jurisdiction over every claim that can somehow be cast in terms of an unfair labor practice." *Keller v. City of Columbus,* 100 Ohio St.3d 192, 195, 797 N.E.2d 964, 969 (Ohio 2003). Importantly, the civil rights protected by Title VII exist independent of any rights created by Ohio's collective bargaining laws. *Gilbert v. Correction Reception Ctr.*, No. 2:07-CV-624, 2008 WL 4347231, at *7–8 (S.D. Ohio Sept. 19, 2008).

OCSEA argues that this Court lacks subject matter jurisdiction over Ms. Detillion's claims because she has couched a claim for breach of the duty of fair representation as claims for discrimination. It asserts that she essentially argues OCSEA violated its duty of fair and impartial representation by refusing to continue to pursue the grievance of her termination.

Although Ms. Detillion's allegations against OCSEA can arguably be cast as an unfair labor practice, they can also be construed as violations of Title VII and Ohio Rev. Code Chapter 4112. Though SERB has exclusive jurisdiction over claims related to Ohio Rev. Code Chapter 4117, this Court has subject matter jurisdiction over Ms. Detillion's federal and state discrimination claims. *See Shoemake*, 61 F.Supp.3d at 737–38 (finding that claims independent of Ohio law are not within the exclusive jurisdiction of SERB); *Gilbert v. Corr. Reception Ctr.*, No. 2:07-cv-624, 2008 WL 4347231, at *7-8 (S.D. Ohio Sept. 19, 2008) (to the extent the complaint

could be construed as alleging union violated Title VII by treating plaintiff less favorably that white union members, SERB does not have exclusive jurisdiction over such claims).

### 2.    Aiding and Abetting Claim (Count 8)

Having dismissed Ms. Detillion's underlying state law discrimination claims against DRC, her claim for aiding and abetting discrimination fails. *Brahmamdam v. TriHealth, Inc.*, No. 1:19-CV-152, 2022 WL 1539535, at *13 (S.D. Ohio May 16, 2022) (finding that the plaintiff's aiding and abetting claim under the Ohio Revised Code fails because the plaintiff failed to show a triable issue of fact regarding the underlying discrimination claims). OCSEA's Motion for Summary Judgment as to Ms. Detillion's aiding and abetting claim (Count 8) is **GRANTED**.

### 3.    Discrimination Claims (Counts 1, 3)

"[F]ederal case law interpreting Title VII is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civ. Rts. Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981); *see also Noble v. Brink Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004) (stating same). Accordingly, the Court will analyze Ms. Detillion's federal and state law claims together.

Ms. Detillion alleges that the OCSEA discriminated against her on the basis of sex and race when it 1) refused to grieve DRC's actions between December 2019 and September 2020, 2) withdrew its grievance on her termination without her consent and did not advance it to arbitration, and 3) used a fictious date of hire for her employment in relation to her grievance.

### i.    Grievances between December 2019 and September 2020

Ms. Detillion has provided no evidence that OCSEA took an adverse employment action against her by refusing to file grievances on her behalf between December 14, 2019, and September 2020.[10] When Ms. Detillion complained about her reassignment and the length of the internal investigation, OCSEA filed a grievance on her behalf in March 2020; she has shown no instances where she sought to file a grievance but OCSEA refused. (OCSEA Detillion Dep. Ex. U-19, U-20, ECF No. 62-1, PAGEID # 1489-94.) Even if OCSEA refused to do so, Ms. Detillion was free to file her own grievance. (*See* Hill Dep. 22:2-12, ECF No. 63, PAGEID # 1894.)

### ii.    Withdrawing the Grievance of Her Termination

Ms. Detillion has not met her *prima facie* burden under the fourth element, wherein she again claims that she was treated differently than Mr. Brodie. But OCSEA treated the two differently because Mr. Brodie had 10 years with DRC

---

[10] Ms. Detillion's Title VII claim that OCSEA refused to file grievances on her behalf between December 2019 and September 2020 falls outside the limitations period and are time-barred for failure to exhaust her administrative remedies. Because Ms. Detillion filed her EEOC charge against OCSEA in September 2021, any alleged discriminatory actions by OCSEA must have occurred before November 2020. *See Williams v. Nw. Airlines, Inc.*, 53 F. App'x 350, 351 (6th Cir. 2002) (explaining that failure to exhaust administrative remedies is a basis for dismissal); *see also Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009) (citing 42 U.S.C. § 2000e–5(e)(1) (stating that a plaintiff must file a charge of discrimination with the EEOC within 300 days of the alleged act of discrimination).

(double the time that Ms. Detillion had worked), he had no prior discipline (while Ms. Detillion had a discipline on her record), and he had not been placed on No Inmate Contact status (but Ms. Detillion was reassigned) before his termination. Moreover, Ms. Hill had concerns that Ms. Detillion refused to accept responsibility for her actions vis-à-vis Mr. Jones's death. Mr. Brodie and Ms. Detillion were not similarly situated.[11] (Hill Dep. Ex. A, ECF No. 72-2, PAGEID # 4470.)

### iii.  Fictious Date of Hire

As to her claim that OCSEA used a fictious date of hire when considering whether to arbitrate her grievance, Ms. Detillion has not shown how Ms. Hill's scrivener's error was an adverse employment action. But even if it were an adverse action, the Discharge Review Committee had the correct information before it because it had Ms. Detillion's entire work history with her correct date of hire. (Hill Decl. Ex. A, ECF No. 72-2, PAGEID # 4475-77.)

Accordingly, OCSEA's Motion for Summary Judgment is **GRANTED**.

## V.  CONCLUSION

For the reasons set forth above, Defendant Ohio Department of Rehabilitation and Correction's Motion for Summary Judgment (ECF No.76) and Defendant Ohio Civil Service Employees Association, AFSCME Local 11's Motion

---

[11] Additionally, the ultimate decision-maker who denied Ms. Detillion's appeal of the dismissal of her grievance was OCSEA's General Counsel (a white woman), which further weakens any inference of discrimination. *See Garrett v. Ameritech Servs., Inc.*, No. 09-CV-12581-DT, 2011 WL 902095, at *5 (E.D. Mich. Mar. 15, 2011) (citation omitted) ("Cases have held that when the decision-maker is in the same protected class as the plaintiff, an inference of discrimination is weakened or the likelihood of discrimination is lessened.").

for Summary Judgment (ECF No. 72) are **GRANTED**. The Clerk shall enter judgment accordingly and **TERMINATE** this case from the docket records of the United States District Court for the Southern District of Ohio.

      **IT IS SO ORDERED.**

                                  /s/ Sarah D. Morrison
                                  **SARAH D. MORRISON**
                                  **UNITED STATES DISTRICT JUDGE**